J-S13043-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: T.P., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.P., NATURAL MOTHER | No. 1794 WDA 2014 |

Appeal from the Decree entered October 3, 2014,
in the Court of Common Pleas of Allegheny County, Orphans'
Court, at No: TPR 100 of 2014

BEFORE:  BENDER, P.J.E., MUNDY, and STABILE, JJ.

MEMORANDUM BY STABILE, J.:                    **FILED APRIL 9, 2015**

L.P. (Mother) appeals from the decree entered October 3, 2014, in the Court of Common Pleas of Allegheny County, which involuntarily terminated Mother's parental rights to her minor daughter, T.P. (Child), born in July of 2009.[1]  We affirm.

In June of 2012, the Allegheny County Department of Human Services, Office of Children, Youth and Families (CYF) received reports that Mother was not caring for Child properly, and that she was not addressing Child's medical needs.  In addition, there were concerns with respect to Mother's mental health.  Child was adjudicated dependent on February 15, 2013, and placed in the care of her great-aunt, M.H., and great-uncle, D.H. (collectively, the Foster Parents).

On June 5, 2014, CYF filed a petition to involuntarily terminate Mother's parental rights to Child.  A termination hearing was held on October

---

[1] The parental rights of Child's father, T.E. (Father), were terminated by a separate decree entered that same day.  Father is not a party to the instant appeal.

1, 2014, during which the orphans' court heard the testimony of CYF caseworker, David Reagan; Dr. Neil Rosenblum, a psychologist who conducted evaluations of Mother, Child, and the Foster Parents; and Mother. The court entered its decree involuntarily terminating Mother's parental rights on October 3, 2014. On October 30, 2014, Mother timely filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Mother now raises the following issue for our review. "Did the [orphans'] court abuse its discretion and/or err as a matter of law in concluding that termination of [Mother's] parental rights would serve the needs and welfare of the Child pursuant to 23 Pa.C.S.[A.] §[]2511(b)?" Mother's brief at 5.

We consider Mother's claim mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks

omitted).

Termination of parental rights is governed by Section 2511 of the

Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated

analysis.

> Initially, the focus is on the conduct of the parent. The party
> seeking termination must prove by clear and convincing
> evidence that the parent's conduct satisfies the statutory
> grounds for termination delineated in Section 2511(a). Only if
> the court determines that the parent's conduct warrants
> termination of his or her parental rights does the court engage in
> the second part of the analysis pursuant to Section 2511(b):
> determination of the needs and welfare of the child under the
> standard of best interests of the child. One major aspect of the
> needs and welfare analysis concerns the nature and status of the
> emotional bond between parent and child, with close attention
> paid to the effect on the child of permanently severing any such
> bond.

***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Mother's parental rights

pursuant to Sections 2511(a)(2), (5), (8), and (b), which provide as follows.

> **(a) General rule.--**The rights of a parent in regard to a child
> may be terminated after a petition filed on any of the following
> grounds:

> ***

> > (2) The repeated and continued incapacity, abuse,
> > neglect or refusal of the parent has caused the child
> > to be without essential parental care, control or
> > subsistence necessary for his physical or mental
> > well-being and the conditions and causes of the
> > incapacity, abuse, neglect or refusal cannot or will
> > not be remedied by the parent.

\*\*\*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\*\*\*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\*\*\*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).

Instantly, Mother concedes that CYF presented clear and convincing evidence that her parental rights should be terminated pursuant to Section 2511(a). Mother's Brief at 9 ("CYF, the petitioner, did clearly and convincing establish threshold grounds for termination pursuant to 23 Pa.C.S.[A.] § 2511(a)(2)."). Thus, we need only consider whether the court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(b). *See In re Adoption of R.K.Y.*, 72 A.3d 669, 679 n.4 (Pa. Super. 2013), *appeal denied*, 76 A.3d 540 (Pa. 2013) (declining to address Section 2511(b) where the appellant did not make an argument concerning that section).

Section 2511(b) "focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010). As this Court has explained, "Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered" as part of our analysis. *In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa. Super. 2008). "While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the

best interest of the child." *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)

(citing *K.K.R.-S.*, 958 A.2d at 533-36).

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*Id.* (quoting *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010)); *see also In re T.D.*, 949 A.2d 910, 920-23 (Pa. Super. 2008), *appeal denied*, 970 A.2d 1148 (Pa. 2009) (affirming the termination of parental rights where "obvious emotional ties exist between T.D. and Parents, but Parents are either unwilling or unable to satisfy the irreducible minimum requirements of parenthood," and where preserving the Parents' rights would prevent T.D. from being adopted and attaining permanency).

Here, the orphans' court concluded that terminating Mother's parental rights would be in the best interest of Child. Orphans' Court Opinion, 11/26/14, at 4. The court reasoned that Child is bonded with her foster family, and that Child is doing well in their care. *Id.* The court also found that Mother's failure to visit regularly with Child weakened Child's bond with Mother, that terminating Mother's parental rights would not adversely impact this bond, and that termination would not be a "tremendous detriment" to Child. *Id.* at 4-5. The court determined that Mother remains incapable of

parenting Child, and that it would not serve Child's needs and welfare to continue waiting for Mother to improve. *Id.* at 5. Finally, the court noted that Child's current foster placement with her great uncle and aunt will allow for Child to maintain contact with Mother. *Id.*

Mother argues that the court abused its discretion by focusing improperly on Mother's failings as a parent rather than Child's needs and welfare. Mother's Brief at 12-13. Mother also contends that the court "completely failed to analyze the potential effect" that termination would have on Child, and that the court instead relied on conjecture that Child will be able to maintain a relationship with Mother in order to justify termination. *Id.* at 13.

After a thorough review of the record in this matter, we conclude that the orphans' court did not abuse its discretion by involuntarily terminating Mother's parental rights to Child. During the October 1, 2014 termination hearing, CYF caseworker, David Reagan, testified that he has been working on Mother's case since September of 2012. N.T., 10/1/14, at 29. Mr. Reagan indicated that Mother's family service plan (FSP) goals included improving her mental health, improving her parenting ability, visiting with Child, attending all medical appointments, and maintaining and/or obtaining housing. *Id.* at 33-34. Mr. Reagan noted that Mother "had a long history of mental health issues," and that this "was the major goal." *Id.* at 34. Mr. Reagan explained that Mother initially was receiving mental health treatment

through, *inter alia*, her high school. *Id.* at 35. However, Mother graduated in June of 2013. *Id.* at 36. Mr. Reagan indicated that Mother's high school mental health team referred her to several new service providers, but Mother failed to obtain additional treatment. *Id.* Mother then moved to Ohio in October of 2013. *Id.* at 36. Mr. Reagan stated that Mother did not receive any mental health treatment while living in Ohio. *Id.* at 37. Mother returned to Pennsylvania in March of 2014, and received mental health treatment at FamilyLinks. *Id.* at 36-37. However, Mother attended only three of her seven scheduled appointments. *Id.* at 37. Mr. Reagan noted that, to his knowledge, Mother did not receive any additional mental health treatment from April of 2014 until August of 2014. *Id.*

Concerning Mother's other FSP goals, Mr. Reagan testified that Mother was given a parenting goal because she was not properly caring for Child's heart condition and asthma, and because Mother was "never there to take care of the child." *Id.* at 38-39. Mr. Reagan conceded that Mother completed a parenting course while she was living in Ohio, and that Mother provided him with a certificate. *Id.* at 42. However, Mr. Reagan expressed concern that the certificate "didn't say what they did, how long [the course] was, what it involved or anything like that . . . ." *Id.* Mr. Reagan noted that Mother has not "shown any signs of attending any medical appointments, and that "there hasn't been any sign whatsoever that, . . . she's capable of taking care of the child." *Id.* at 41-42. As a result, Mr. Reagan stated that

CFY referred Mother to a new parenting program after she returned to Pennsylvania. *Id.* at 49. Mr. Reagan stated that the program sent Mother letters and called her several times, but that Mother did not respond. *Id.*

Mr. Reagan further testified that Mother underwent "several evaluations," all of which recommended that Mother move out of her mother's home. *Id.* at 38. According to Mr. Reagan, this was because there was "a lot of conflict in the home." *Id.* at 37-38. Mr. Reagan testified that CYF made two referrals to assist Mother with housing in October of 2012, and in "January or February of '13," but that no referrals were made after that point because Mother was uncooperative, kept changing residences, and did not ask for another referral. *Id.* at 44-45. Mr. Reagan stated that Mother's high school mental health team also made referrals up until July of 2013. *Id.* at 45-47.

With respect to visitation, Mr. Reagan stated that Mother initially was scheduled to visit with Child once per week, but that Mother only attended one of her first twenty visits. *Id.* at 39-40. Accordingly, Mother's visits were reduced to once every two weeks. *Id.* at 40. Mother only attended 14 of her 42 scheduled visits during Mr. Reagan's time as the caseworker. *Id.* at 39, 42. Concerning Child's relationship with the Foster Parents, Mr. Reagan testified that "they are bonded," and that Child calls the Foster Parents "mom and dad." *Id.* at 51.

Dr. Neil Rosenblum testified that he conducted evaluations of Mother, Child, and the Foster Parents. *Id.* at 54-55. Dr. Rosenblum explained that he evaluated Child and the Foster Parents on June 27, 2013. *Id.* Dr. Rosenblum stated that Child "interacted very comfortably" with the Foster Parents during the evaluation, and that she "seemed to be very well integrated into the home environment." *Id.* at 55-56. Moreover, the Foster Parents were "very nurturing" to Child, and "provided her with excellent developmental support." *Id.* at 56. Dr. Rosenblum further testified that he completed a second evaluation of Child and the Foster Parents on April 14, 2014, that Child "seemed to be very secure with foster parents" and had "become a very involved member of their family." *Id.* at 54, 68. Dr. Rosenblum noted that Child appeared to have a good relationship with the Foster Parents' son, T. *Id.* Dr. Rosenblum explained that, during the first evaluation, Child went back and forth between calling the Foster Parents "aunt and uncle" and "mom and dad." *Id.* at 69. However, during the second evaluation, Child called the Foster Parents "mom and dad" exclusively. *Id.* Dr. Rosenblum opined that there was "a very strong bond" between Child and the Foster Parents.

Dr. Rosenblum also described his July 30, 2014 evaluation of Child and Mother. *Id.* at 57-58. Dr. Rosenblum testified that, while Mother did not "show, . . . a great deal of enthusiasm" with Child, Mother was very patient with Child, Child also was "very comfortable" with Mother. *Id.* at 57-58.

Concerning Mother's mental health, Dr. Rosenblum explained that he diagnosed Mother with major depressive disorder, and that Mother's mental health issues were "significant and very serious." *Id.* at 59-60. Dr. Rosenblum opined that, while Mother did well with Child during her one-hour evaluation, Mother's depression would be "a significant barrier to her being able to adequately meet her own needs let alone the needs of a young child" over the long term. *Id.* at 60-61. Dr. Rosenblum explained that his prognosis with respect to Mother was guarded, due to Mother's lack of housing and employment, and "given the situation that she's in and the resources that she had available to her," but that "with intensive mental health treatment, it would be possible to make some progress." *Id.* at 62-64.

Dr. Rosenblum testified that he completed a second evaluation of Child and Mother on April 21, 2014. *Id.* at 54, 64. Dr. Rosenblum stated that Mother "still presented as being depressed," and that she made "really no significant forward movement" during the year between evaluations and "was pretty much back at square one." *Id.* at 65, 67. Dr. Rosenblum further testified that Child "has a concept of two mothers and she refers to both of them as mom." *Id.* at 58, 72. However, Dr. Rosenblum explained that Child "seemed to have somewhat less of a bond" with Mother than she did with the Foster Parents. *Id.* at 69. Dr. Rosenblum opined that Child would not suffer a severe detriment if Mother's parental rights were

terminated, as Child has "moved on" from her relationship with Mother and that, while Child cares about Mother and enjoys seeing her, Child now views her foster parents as her primary caretakers. *Id.* at 70-71. On cross-examination, Dr. Rosenblum confirmed that it would serve Child's best interests to maintain a relationship with Mother. *Id.* at 72-73.

Mother testified that she began mental health treatment at FamilyLinks approximately a month prior to the October 1, 2014 termination hearing. *Id.* at 77. Mother indicated that, prior to FamilyLinks, she last received treatment around the time she graduated from high school in July of 2013. *Id.* at 77-78. Mother explained that she initially failed to obtain mental health treatment after graduation because she lacked transportation, because her phone calls were not being returned, and because of "[a] lot of miscommunication" with Mr. Reagan. *Id.* at 77-78. Similarly, Mother testified that she did not pursue the parenting program recommended by Mr. Reagan because there were "a lot of communication problems." *Id.* at 79. Specifically, Mother stated that she did not receive a letter from the program, and that she did not have a cell phone, which prevented anyone at the program from calling her back. *Id.* at 78-79. Mother stated that she continues to visit with Child, and that Child calls her "mommy" and wants to leave with her at the conclusion of visits. *Id.* at 79-80.

Thus, the testimony presented during Mother's termination hearing confirms that it is in Child's best interest to terminate Mother's

parental rights. Child is bonded with her foster parents, who provide her with appropriate care and support. In contrast, at the time of the termination hearing, Mother had not cared for Child for over a year and a half. Mother also had failed to make significant progress toward improving her mental health, and it did not appear that Mother would be able to provide appropriate care for Child any time soon. In addition, while Dr. Rosenblum opined that Child still is bonded with Mother, he explained Child has "moved on" and no longer views Mother as her primary caretaker. As a result, it is clear that the bond between Mother and Child in this case is outweighed by Mother's inability to care for Child, and by the permanence and stability provided by the Foster Parents. *See T.D.*, 949 A.2d at 920-23; *J.M.*, 991 A.2d at 325 (quoting *In re Adoption of R.J.S.,* 901 A.2d 502, 513 (Pa. Super. 2006)) ("'The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.'").

Further, we note that Mother's argument that the orphans' court focused improperly on Mother's failings as a parent, rather that Child's best interest and welfare, does not entitle her to relief. Mother is correct that "[t]he focus in terminating parental rights under [S]ection 2511(a) is on the parent, but the focus turns to the children under [S]ection 2511(b)." *In re M.T.*, 101 A.3d 1163, 1181 (Pa. Super. 2014) (*en banc*) (citing *In re*

*Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*)). However, it is clear that a parent's inability to care for his or her child is a relevant consideration in determining whether termination will serve a child's needs and welfare. *See C.L.G.*, 956 A.2d at 1010 (affirming the termination of parental rights where "the trial court emphasized mother's inability to meet the parental duties required for the well-being of the child" as part of its Section 2511(b) analysis); *M.T.*, 101 A.3d at 1182 (quoting favorably from a trial court opinion addressing the parents' "inability to consistently provide a safe and secure environment for their children" as part of its Section 2511(b) analysis).

We also reject Mother's argument that the court failed to analyze the effect that termination of her parental rights would have on Child, and instead relied on conjecture concerning the possibility of a future relationship between Mother and Child in order to justify termination. This contention is contradicted by the court's opinion, in which it accepted Dr. Rosenblum's testimony that termination would not cause Child to suffer a "tremendous detriment." *See* Orphans' Court Opinion, 11/26/14, at 5. While the court's comments indicating that Child will be able to maintain a relationship with Mother were somewhat speculative, it appears that this consideration played only a small role in the court's decision. No relief is due.

Accordingly, because we conclude that the orphans' court did not abuse its discretion by involuntarily terminating Mother's parental rights to Child, we affirm the decree of the orphans' court.

Decree affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/9/2015